IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Theron Andrew Rodden, | ) | C/A No. 1:12-503-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Timothy M. Cain's April 10, 2012, order referring this matter for disposition. [Entry #13.] The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals.

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Procedural and Factual Background

A.    Procedural History

On December 6, 2001, Plaintiff filed applications for DIB and SSI under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433, 1381–1383c. Tr. at 15. In his applications, he alleged his disability began on November 27, 2001. *Id.* His applications were denied initially and not pursued. *Id.* On November 8, 2005, Plaintiff filed a second round of applications for DIB and SSI in which he alleged his disability began on April 1, 2003. Tr. at 110–12, 115–18. His second applications were denied initially and upon reconsideration. Tr. at 67–68, 75–78. Plaintiff requested and was granted a hearing before an Administrative Law Judge ("ALJ") on August 18, 2008. Tr. at 27–42. The ALJ issued an unfavorable decision on September 17, 2008, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought a civil action in this court challenging the Commissioner's decision. Tr. at 452–53. On August 9, 2011, the court remanded the case to the Commissioner for further proceedings. Tr. at 406–07.

On remand, the Appeals Council vacated the ALJ's original decision and remanded the case to ALJ Richard Vogel for another hearing and a new decision. Tr. at 447–49. The ALJ held a new hearing on December 9, 2011 (Tr. at 377–401), and, on February 2, 2012, issued a partially-favorable decision finding Plaintiff disabled as of February 2010. Tr. at

361–72. The ALJ found that Plaintiff had not been under a disability for purposes of his DIB claim at any time from his onset date through his date last insured. Tr. at 372. With regard to his SSI claim, the ALJ further found that Plaintiff had not been under a disability from his onset date through February 10, 2010, when his age category changed and entitled him to a finding of disabled under the Medical-Vocational Guidelines. Tr. at 371. Plaintiff subsequently filed this action seeking judicial review of the unfavorable portion of the Commissioner's decision in a complaint filed on February 23, 2012. [Entry #1.]

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was born on February 10, 1955. Tr. at 120. He completed his GED. Tr. at 130. His past relevant work ("PRW") was as a carpenter. Tr. at 126.

2.      Medical History

On September 22, 2002, Plaintiff was admitted to Bon Secours–St. Francis Xavier Hospital emergency room ("ER") for an overdose of alcohol and opiate pain medication. Tr. at 184–85. He reported a history of depression and treatment with a local psychiatrist. Tr. at 190. His drug screen was positive for opiates and marijuana, and his blood-alcohol level was .276 on arrival. Tr. at 185, 188, 201. Plaintiff was initially "extremely combative and violent," but calmed down once his delirium cleared. Tr. at 185–86. The ER doctor, Michael Maynor, M.D., diagnosed Plaintiff with opiate overdose, alcohol intoxication, and chronic depression with suicidal intent. Tr. at 191. Dr. George Geils, Jr., diagnosed multi-substance

3

abuse and delirium and transferred Plaintiff's care to Dr. John F. Abess for psychiatric treatment of delirium. Tr. at 185, 189. Dr. Abess diagnosed alcohol-induced delirium, severe alcohol-withdrawal delirium, alcohol dependence, and opiate overdose while intoxicated on alcohol. Tr. at 186. Commitment proceedings were abandoned, and Plaintiff was discharged to his home on October 2, 2002. Plaintiff reported he would not drink again. Tr. at 187. He agreed to participate in an outpatient alcohol rehabilitation program. Tr. at 186.

On December 8, 2004, Plaintiff went to the ER complaining of a toe injury. Tr. at 176, 181. He left without receiving treatment, citing financial difficulties. *Id.*

On September 29, 2005, Plaintiff went to Charleston Memorial Hospital ("Charleston Memorial") for radiating lower back pain after having moved boxes two weeks earlier. Tr. at 213. He reported a history of hepatitis C, lumbar disc disease, and hypertension. Tr. at 213. He demonstrated a radicular pattern of pain, but had good strength. Tr. at 214. A physician diagnosed back and radicular pain and prescribed Lortab and Motrin. Tr. at 214.

On October 26, 2005, Plaintiff went to the Medical University of South Carolina ("MUSC") complaining of back pain and reporting a four-year history of chronic low back pain with radiation to the left hip and leg. Tr. at 211–12. Examination revealed negative straight leg raising tests and full range of motion. *Id.* The attending physician diagnosed chronic back pain and left-sided sciatica. Tr. at 212.

4

On November 17, 2005, Plaintiff went to Franklin C. Fetter Family Health Center ("Fetter") for follow-up on his blood pressure. Tr. at 219.[1]

On November 28, 2005, Plaintiff went to Fetter with complaints of low back pain with occasional radiation to the left leg, and he had bloodwork performed. Tr. at 218, 346–47.

On December 27, 2005, Plaintiff returned to Fetter for prescription refills. Tr. at 217.

On December 1, 2005, Plaintiff went to MUSC complaining of radicular back and left hip pain. An MRI of Plaintiff's spine revealed multilevel degenerative disc disease with mild bilateral neuroforaminal stenosis at L4/5. Tr. at 210. An MRI of Plaintiff's hips taken the same day was unremarkable. Tr. at 209.

On January 4, 2006, Plaintiff went to the ER at Charleston Memorial with complaints of back pain. Tr. at 350. Examination revealed decreased range of motion, tenderness in the lumbar region, positive straight leg raise, depression, and difficulty ambulating. Tr. at 350. Medication was prescribed, including oxycodone. Tr. at 353–54.

On March 15, 2006, M. Patrick Jarrell, Ph.D., a state-agency psychological consultant, reviewed Plaintiff's records and found he did not have a medically-determinable mental impairment. Tr. at 220. Dr. Jarrell indicated depression had been mentioned only once in the medical history section of one clinic note. Tr. at 223. He further noted Plaintiff was not receiving treatment or prescription drugs for psychological issues, although he reported

---

[1] Many of the records of Plaintiff's treatment at Fetter are illegible. Tr. at 218, 338–43.

having received treatment in the distant past for problems with depression and anxiety. Tr. at 223, 232. Dr. Jarrell also noted that Plaintiff's current problems stemmed from his physical condition, and that he was able to attend to his activities of daily living ("ADLs"). Tr. at 232.

On March 16, 2006, William Cain, M.D., a state-agency medical consultant, reviewed Plaintiff's records and found that his hepatitis C and back-and-hip pain were not severe impairments. Tr. at 234. Dr. Cain noted that Plaintiff's lumbar MRI report was "a bit concerning," but that all his physical examinations from MUSC showed he had normal neurological functioning, full range of motion, and negative straight leg raising tests. Tr. at 235.

On March 29, 2006, Plaintiff returned to Fetter for a check up and prescription refill. Tr. at 238. He complained of being under a lot of stress because of financial problems, denied suicidal tendencies, and had a normal affect and thought processes. Tr. at 238. He was diagnosed with elevated cholesterol and depression and referred to a psychiatrist. Tr. at 238.

On June 28, 2006, Plaintiff went to Fetter, complaining of pain and tenderness, and he had bloodwork performed. Tr. at 343, 344–45. His mood was noted to be anxious. *Id.* He reported awaiting a mental health appointment. *Id.*

On June 29, 2006, Arthur Wolinsky, M.D., examined Plaintiff at the request of the state agency. Tr. at 241–45. Plaintiff reported that he had been laid off from his job three-to-four years earlier because his employer considered him a liability after he received treatment at a mental hospital. Tr. at 242. He said that he injured his low back when he was in his

6

twenties and that the condition had progressively worsened as he injured his back ten times over the years. Tr. at 242. He reported having had two MRIs that showed his hip was okay and that his left hip and leg pain was due to pinched nerves in his back. *Id.* He said he had three herniated discs in his lumbar spine that caused intermittent episodes of severe pain, most recently in September 2005 and January 2006, but that his pain was more often mild. Tr. at 242. He reported no difficulties with fine and gross movements on a sustained basis, including preparing food, attending to his personal hygiene, filing, and other ADLs except during acute episodes, and he complained of a sensation of foot drop on the left. Tr. at 242. He denied a history of surgery or injections for back pain. Tr. at 242. Plaintiff also complained that he was easily fatigued. Tr. at 242. He reported a history of untreated hepatitis C. Tr. at 242. He reported Hydrochlorothiazide and Zetia as his current medications. Tr. at 243. He stated that he had been hospitalized at least five times for suicide attempts and that he continued to suffer from depression. Tr. at 242. He expressed concern about his ability to do any kind of work because of his potential of rehospitalization for mental illness and flare-ups of back pain. Tr. at 242. Plaintiff reported smoking one pack of cigarettes per day for the last thirty years, drinking a couple of pints of alcohol per week, and using marijuana. Tr. at 243. Dr. Wolinsky found Plaintiff had a normal range of motion and no deformities or effusion in the joints, normal gait and station, normal pulses in the lower extremities, decreased sensation over the left foot, absent ankle jerk reflex on the left, a positive straight leg raising test on the left, and decreased sensation in his left foot. Tr. at 244.

7

Dr. Wolinsky strongly suspected Plaintiff had left lumbar radiculopathy and noted that foot drop may be intermittently objectively demonstrable even though not demonstrated at that exam. Tr. at 245. Dr. Wolinsky also stated that Plaintiff's fatigue "may be due to hepatitis C in combination with his other problems." Tr. at 245.

Plaintiff attended counseling sessions at MUSC with varying frequency from August 23, 2006, through December 2007, as detailed below. Tr. at 286–321. Treatment issues included mood stabilization, adjustments to medication regimen, and problems related to his separation from his wife and daughter. Tr. at 305–21.

On August 23, 2006, Plaintiff went to MUSC complaining that he felt "jumpy [and] hyper." Tr. at 326. He reported wanting to start treatment for hepatitis C, but needed to regulate his mood first. Tr. at 326. He stated that he was "manic depressive," for which he had never been prescribed medication, that he had stopped drinking on July 25, 2006, after realizing that he had been drinking too much (three to four pints a week). *Id.* He reported smoking about one joint of marijuana per day to keep "from going crazy." Tr. at 326. He was tangential and circumstantial, but redirectable. *Id.* He wanted to try medication, but did not want to be hospitalized. *Id.* Examination notes reflect that Plaintiff was unkempt, in a terrible mood, suffering from poor sleep, decreased concentration and memory, significant impairment in insight, and mildly-impaired judgment. Tr. at 329–32. He reported having suicidal ideations while in jail the prior month for having threatened to burn the house down.

8

Tr. at 331. He reported his wife had left him in early August. Tr. at 323, 331, 334. He stated that he enjoyed boating. Tr. at 332.

Examination notes from Plaintiff's August 24, 2006, visit to MUSC indicate Plaintiff was alert, verbal with pressured speech, and easily agitated, but redirectable. Tr. at 323. A clinician prescribed Depakote, Seroquel, and individual counseling. Tr. at 324. The examiner also noted the need to rule out an organic mental disorder because of a head injury, as opposed to bipolar affective disorder. *Id.* The clinician noted a question about whether Plaintiff would take the prescribed medications because he preferred marijuana and was concerned about the copay for legitimate medications. *Id.*

On August 25, 2006, MUSC notes reflect that Plaintiff told staff that his medication was too strong, and he was taken off Seroquel. Tr. at 322.

On August 28, 2006, psychiatrist John V. Custer, M.D., evaluated Plaintiff at the request of the state agency. Tr. at 248–52. Plaintiff reported that he was hospitalized for psychiatric problems in 2001 because he had become suicidal a month after his mother died. Tr. at 248. He stated that he stopped drinking one month prior to his appointment, after he had been involved in an incident of domestic violence with his common-law wife's daughter while drinking. *Id.* He stated the police arrived and arrested him for an outstanding warrant for criminal domestic violence, which resulted in a 20-day incarceration. Tr. at 248. He reported a history of alcohol-related problems throughout his adult life and a long history of frequent marijuana use, and stated he wanted to quit drinking. Tr. at 249–50. He stated that

he had tried to find work after he lost his job in 2001, but he suspected employers did not hire him because of his bad back.  Tr. at 249. He said that "[a]fter a while, he just stopped trying to find work." *Id.* He said he was counting on obtaining Social Security disability benefits in order to pay his common-law wife and avoid having to pay child support. *Id.* He reported working construction all his life and stated that he was "too old to learn a new trade."  Tr. at 250. He also felt that he will not live past sixty, so it was not really worth it to learn something new.  *Id.* He reported needing seven to eight hours of sleep, but only getting three to four because of worry about money, bills, and his broken-down car. *Id.* He reported a history of four psychiatric hospitalizations, most recently in 2001, and denied treatment for substance abuse aside from a program he completed after receiving a DUI eleven years ago. *Id.* He reported a long history of frequent marijuana use and a one-pack-a-day smoking habit. *Id.* With regard to daily activities, he said that he tried to stay busy by writing letters to his common-law wife and her daughter, attending appointments, doing paperwork, and reading. *Id.* He said he was mainly unable to work because of lower back pain. Tr. at 249. Dr. Custer found Plaintiff appeared a little hyperactive and had "intense" affect, "but mostly on the happy side," and good concentration and attention. Tr. at 250–51. Dr. Custer diagnosed alcohol dependence in early remission, cannabis dependence in partial remission, nicotine dependence, and possible cyclothymia (mild bipolar disorder). Tr. at 251. Dr. Custer stated that Plaintiff appeared to have significant problems with alcohol abuse over the years and that his symptoms would improve significantly with abstention from alcohol. Tr. at 251. He

10

also noted the possibility of underlying cyclothymic disorder, which he thought could be successfully treated with psychiatric medication. Tr. at 251. His overall prognosis was favorable as long as Plaintiff abstained from substance abuse. *Id.*

On August 30, 2006, MUSC notes reflect Plaintiff's mood was slightly better, and he continued to report that his Seroquel was too strong, but that the Depakote was tolerable. Tr. at 321. The doctor increased the Depakote prescription. Tr. at 320.

On September 18, 2006, MUSC notes show that Plaintiff was slightly improved, still displaying pressured speech, and writing 15-page letters each day. Tr. at 319. He noted he was lonely and separated from his family. Tr. at 318. He denied alcohol use since July, but reported using marijuana on occasion. Tr. at 319. He reported sleeping fairly well and noted he had a roommate. *Id.*

On September 26, 2006, Jeffrey Vidic, Ph.D., a state-agency psychological consultant, reviewed Plaintiff's records and found he did not have a severe mental impairment. Tr. at 253. Dr. Vidic reported that Plaintiff had a mild mood disorder (chronic, untreated) and a personality disorder that caused no limitations in ADLs, mild limitations in social functioning, mild limitations in concentration, and no extended episodes of decompensation. Tr. at 254, 263.

On September 27, 2006, Plaintiff went to Fetter complaining of poor circulation in his arm, numbness, and tingling, and lower back pain. Tr. at 342. On examination, Plaintiff was

"not ill-looking," displayed pressured speech, and reported receiving mental health treatment. *Id.*

On October 4, 2006, Jean Smolka, M.D., a state-agency medical consultant, assessed Plaintiff's residual functional capacity based on a review of his records. Tr. 273–80. Dr. Smolka reported that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk for six hours and sit for six hours in an eight-hour workday; and occasionally stoop and climb ladders, ropes, and scaffolds. Tr. at 273–80.

On October 4, 2006, Plaintiff arrived late for his appointment, having overslept. Tr. at 316. The notes from his appointment show that Plaintiff experienced adverse response to his sedatives, including mood swings, particularly when dealing with his now-separated wife on the phone. Tr. at 317. Exam showed that his sleep had improved, he remained labile and easily agitated, anxious, and had poor concentration and insight. *Id.* The dosage of Seroquel and Depakote was increased. *Id.*

On October 12, 2006, MUSC notes reflect Plaintiff's mood was "about the same." Tr. at 315. He noted Thanksgiving was the hardest time for him, as his mother died the day before Thanksgiving three years prior. *Id.* Plaintiff was tearful talking about his mother's death and his wife's departure. Treatment notes indicate Plaintiff was somewhat labile, but stayed in control. *Id.* The nurse noted that Plaintiff had few coping skills, pressured speech, was easily agitated, but redirectable, exhibited no psychosis, denied suicidal and homicidal ideations, had poor concentration and insight, and depressed mood, although his sleep was

12

improved with his medications. Tr. at 314. The dosage of Seroquel and Depakote was increased. *Id.*

On October 17, 2006, MUSC notes reflect Plaintiff reported his mood was better, that he was having a good day, had good communication with his wife, and had fixed his car successfully. He reported a few slips with alcohol, but was that he was mostly abstinent. Tr. at 313.

On October 19, 2006, the MUSC nurse's notes reflect Plaintiff reported sleeping through the night with Seroquel, his mood was improved, that he had talked with his daughter, was getting along with his roommates, and was seeking disability. *Id.* On examination, Plaintiff was alert and oriented times four, easily escalated, but was not as irritable as in the past, was anxious, demonstrated no psychoses, denied suicidal/homicidal ideations, and exhibited mild improvement in focus and concentration. Tr. at 312.

On November 2, 2006, the MUSC counselor's notes reflect Plaintiff was down, had argued with his wife and daughter, and became upset when they said they would not be returning to him. Tr. at 311. The nurse noted Plaintiff easily escalated, but was redirectable, had pressured speech, was anxious, demonstrated no psychoses, had poor concentration and insight, and had sleep disturbances. Tr. at 310.

On November 10, 2006, the MUSC counselor's notes reflect Plaintiff's mood was not better, he had bouts of depression all week and active mood swings, and he reported that Seroquel was no longer effective. Tr. at 308. He was upset over his roommates' behavior and

13

that they kept him up the previous night arguing. *Id.* Plaintiff planned to give his roommates a choice of quitting alcohol or leaving. *Id.* He reported to the nurse that his biggest problem was not having heard from his daughter and that he had been crying last time he was on the phone with her. Tr. at 309. He reported having recently gone to the races in Orangeburg. *Id.* The examination notes showed pressured speech, continued mood lability, flight of ideas, no psychoses, no suicidal/homicidal ideations, difficulty with focus and concentration, improved grooming, difficulty sleeping, and one major bout of depression weekly. *Id.*

On November 17, 2006, the MUSC nurse's notes show that Plaintiff felt better as he had been talking with his wife. Tr. at 307. He remained labile, with disorganized thought processes, racing thoughts, sleep pattern disturbance, poor hygiene, unclean hair, and difficulty with focus/concentration, with fair judgment and insight. *Id.* He received increased dosage of Seroquel and Depakote. *Id.*

On November 30, 2006, Plaintiff cancelled his appointment. Tr. at 306.

On December 8, 2006, Plaintiff called MUSC to report that he was lowering his dosage of Seroquel and Depakote because they were causing bad side effects, including shaky hands that caused him to drop things. Tr. at 305.

On December 12, 2006, Plaintiff went to Fetter and complained of calf pain, which was slightly worse on his right side. Tr. at 341. He also reported occasional wheezing and shortness of breath. *Id.* He was assessed to have intermittent claudication, chronic obstructive pulmonary disease (COPD)/cigarette abuse, and was referred for a vascular examination. *Id.*

14

On Friday, December 15, 2006, Plaintiff went to MUSC and reported worsening depressive mood, fair sleep, low energy, decreased appetite, weight loss, and poor concentration over the past several days. He reported recent passive suicidal ideations, but denied any that day. Tr. at 302–03. He noted he had been off Depakote for seven days and reported increased tearful mood swings. Tr. at 302. He requested assistance with his mood swings. *Id.* On exam, Plaintiff was tearful with pressured speech, depressed mood, and linear thought process. *Id.* He was assessed to be at risk, but not an acute danger to himself. Tr. at 303. Plaintiff's medications were increased, and he was instructed to follow up on Monday. *Id.*

Plaintiff cancelled his appointments for December 20, 2006, because of insurance issues. Tr. at 301–02.

On February 15, 2007, MUSC notes show Plaintiff reported that he was no longer depressed after having reunited with his wife and daughter. Tr. at 300. He reported he had stopped taking Depakote and that he had reduced his Seroquel because he did not have many left. *Id.*

Plaintiff cancelled his appointment MUSC appointments for March 1, 2007, because of insurance issues. He indicated he would call to make other appointments. Tr. at 297–99.

On April 16, 2007, MUSC notes show Plaintiff was not depressed, but reported becoming irritable, citing financial stress as his biggest concern. Tr. at 295. He reported sleeping well and occasional irritability. Tr. at 296. His grooming was improved and his

speech was moderately pressured, but redirectable. *Id.* He had no psychoses, denied suicidal/homicidal ideations, and was compliant with his Seroquel. *Id.*

On May 15, 2007, MUSC notes show Plaintiff was better overall since reuniting with his family. Tr. at 293. He reported one bout of depression the prior week when he "just woke up that way." *Id.* He reported giving up alcohol. *Id.* Plaintiff stated he was awaiting a disability hearing soon. Tr. at 294. He said he was sleeping through the night and was getting depressed occasionally, usually related to family stress. *Id.* On examination, Plaintiff had moderately pressured speech, mild mood lability, and no delusions. *Id.* He was anxious and displayed flight of ideas and mild mood swings. *Id.* All his medications were reviewed, and he was encouraged to take an increased dosage of Seroquel when stressed. *Id.*

On July 19, 2007, MUSC notes show Plaintiff was better, with stable mood, euthymic with no depressive/manic symptoms, and reported less marital conflict, no suicidal/homicidal ideations, no history of psychotic symptoms, continued marijuana use, drinking one pint of Canadian whiskey per week, normal appetite, linear thought process, fair insight, judgment, attention and concentration, and that he was sleeping well. Tr. at 288, 292. He displayed slightly pressured speech and reported that he had not seen a GI specialist because of financial issues. *Id.* He was diagnosed with bipolar disorder, assigned a GAF score of 60, and continued on individual therapy and Seroquel. Tr. at 288.

On July 19, 2007, McLeod F. Gwynette, M.D., noted that Plaintiff reported stable mood, no suicidal tendencies, no panic attacks, normal appetite and sleep, no psychotic

16

symptoms, and no adverse side effects of medication. Tr. at 288. Dr. Gwynette diagnosed bipolar disorder and assigned Plaintiff a GAF of 60. *Id.* He found Plaintiff had fair insight and judgment, fair attention and concentration, euthymic mood, and linear thought processes. *Id.*

On August, 1, 2007, Plaintiff went to Fetter, complaining of back pain after working in his yard. Tr. at 340. He reported smoking, and an exam revealed coarse breath sounds. *Id.* He was prescribed Ultram and told to quit smoking. *Id.*

On August 22, 2007, Plaintiff was evaluated by Daniel Gamé, M.D., of Pulmonary Diseases Care for increasing difficulty with breathing over a period of six months. Tr. at 504–05. He admitted to dyspnea with minimal exertion and occasional wheezes. Tr. at 504. He reported taking Seroquel nightly, but sleeping very little. *Id.* Plaintiff felt he would not be able to stop smoking because of his bipolar disorder. *Id.* Pulmonary function test showed normal spirometry, lung volumes, and diffusion study. Tr. at 505. Dr. Gamé assessed no spirometric evidence of chronic obstructive lung disease related to smoking, noted Plaintiff's exertional dyspnea was unexplained, and stated that Plaintiff may have undiagnosed sleep apnea. *Id.* Dr. Gamé's recommendations included mandatory smoking cessation, overnight pulse oximetry reading, echocardiogram to rule out pulmonary hypertension, and overnight sleep study. *Id.* Chest x-rays revealed no evidence of active intrathoracic disease. Tr. at 506.

On October 30, 2007, MUSC notes show Plaintiff had a stable mood, was calm and cooperative, made good eye contact, and related well. Tr. at 287. His mood was described

17

as euthymic, he had linear thought process, fair insight, judgment, attention, and concentration. *Id.* He was still worried about finances and was on nocturnal oxygen. Tr. at 291. He reported sleeping better after he tapered himself to reduced Seroquel to decrease his groggy morning feeling. *Id.* His speech was still rapid, but fairly organized, and he reportedly drinking moderately. *Id.* His GAF remained at 60. *Id.*

On October 30, 2007, Plaintiff also went to Fetter complaining of back pain and reporting no relief from Ultram. Tr. at 339. The plan was to obtain an MRI of Plaintiff's lumbar spine.[2] *Id.*

On November 28, 2007, Plaintiff presented to Dr. Gamé with no new symptoms. Tr. at 523. Overnight pulse oximetry reading showed periods of desaturation. *Id.* On examination, Dr. Gamé found Plaintiff to be alert and calm with clear lungs. *Id.* Dr. Gamé assessed Plaintiff with unexplained nocturnal hypoxemia and exertional dyspnea of unknown cause and started him on oxygen nightly. *Id.* The doctor also recommended a sleep study and mandatory smoking cessation. *Id.*

On December 18, 2007, MUSC notes show Plaintiff was much better. His stressors were still financial, and he reported hoping a disability settlement would come through. Tr. at 290. He was poorly groomed and disheveled, calm and cooperative, made good eye contact and related well. Tr. at 286. He had a euthymic mood, linear thought process, fair insight,

---

[2] No MRI report was included in the medical records.

judgment, attention, and concentration. *Id.* He continued to have two to three drinks of alcohol each day.  His GAF score remained at 60.  *Id.*

On January 22, 2008, Plaintiff cancelled his MUSC appointment late, reporting car trouble. Tr. at 289.

On March 3, 2008, Plaintiff went to Fetter, complaining of lower back pain and requesting more pain medication. Tr. at 338.

On August 7, 2008, Plaintiff returned to Dr. Gamé and reported continued dyspnea with activities and insomnia. Tr. at 525. He denied cough, sputum production, chest pain, or wheezes. *Id.* He had been unable to obtain a sleep study due to transportation problems.  *Id.*

In April 2009, Plaintiff reported to his counselor, Frederick Stewart, that he had mood swings, difficulty sleeping, and a poor attention span. Tr. at 613. That same day, Dr. Gwynette noted that Plaintiff's mood was stable and euthymic without depressive or manic symptoms; he was sleeping well; and his attention and concentration were fair. Tr. at 614. Dr. Gwynette continued to assigned Plaintiff a GAF score of 60. *Id.* Dr. Gwynette reported the same signs and symptoms in August 2009. Tr. at 618.

On September 24, 2009, Plaintiff was admitted to MUSC's Institute of Psychiatry on a voluntary basis after presenting with suicidal thoughts and threatening to harm himself. Tr. at 531. He admitted that he had been drinking and smoking marijuana. *Id.* He told staff that he had planned to swallow all of his medication. Tr. at 536. He stated he felt like he was psychic sometimes. *Id.* He reported that he had not had any manic symptoms recently and

19

that his depression was triggered by alcohol. *Id.* He stated that he drank three to four pints of whiskey per week and occasionally smoked marijuana. *Id.*

He followed up at MUSC in mid-October, reporting that he was not depressed very often (Tr. at 622) and reported to his counselors that he had a "mostly" stable mood in November 2009 and "mostly good" mood in January 2010. Tr. at 623–24. Also in January 2010, Plaintiff reported that he had been experiencing visual hallucinations for the past five or ten years. Tr. at 625. Otherwise, his mood was euthymic, his concentration was good, and his insight and judgment were fair. *Id.*

Plaintiff continued to receive mental health treatment from MUSC through 2011. *See, e.g.*, Tr. at 636, 638, 640, 644, 647, 651, 659, 669. He reported visual hallucinations (*see* Tr. at 636, 651) and reported both impaired and good concentration. *See* Tr. at 636, 640, 647. He noted that he was depressed less than one day per week (Tr. at 647, 669), and, in July 2010, he noted that he had not had a severe bout of depression in over a year. Tr. at 638. Plaintiff's counselor continued to note Plaintiff's GAF score was 60. Tr. at 654, 663, 667, 670.

On November 22, 2010, Plaintiff was treated at MUSC and sought a prescription for Lortab. Tr. at 583. He reported that he thought he was building up a tolerance to Soma, but had good pain relief when he took a Lortab that was prescribed to one of his friends. *Id.* He described his back pain as cramping that was worse with certain movements, especially lifting and turning. *Id.* The treating physician refused to prescribe Lortab, recommended that

Plaintiff increase his Soma to three times a day, and encouraged him to keep all appointments with mental health. Tr. at 584.

    C.    The Administrative Proceedings

        1.    Plaintiff's First Administrative Hearing

            a.    Plaintiff's Testimony

At his initial hearing on August 18, 2008, Plaintiff testified that after he was hospitalized for depression in September 2002, he was fired from his job because his boss considered him a liability. Tr. at 30. He testified that his bipolar disorder caused him to become "massively depressed" every two-to-three months, that his depressive episodes lasted three-to-four days, and that he had attempted suicide during such episodes. Tr. at 30–31. He said he had not noticed being manic, but that others told him he sometimes became manic. Tr. at 33.  He said his depression sometimes made him not wish to be around others. Tr. at 34. He testified that he had been seeing a psychiatrist for three or four years and that he followed all of the treater's instructions and took his medications each night. *Id.* He indicated the medication made him a bit groggy in the mornings, but that the grogginess cleared up within thirty-to-forty-five minutes. *Id.*

He also testified about his problems with chronic back pain, stating that he had three herniated discs. *Id.* Plaintiff indicated he had experienced flare-ups of acute back pain when mowing his lawn and hanging clothes on a line. Tr. at 34–36. He testified that he could stand for no more than 30 minutes and sit for only 10–15 minutes because of back pain. Tr. at

36–37. Plaintiff said he spent much of his time watching TV, and that he tried to help around the house when he could.  Tr. at 37. He testified that he spent at least an hour a day lying down, and that he would not attempt to lift more than 25 pounds. Tr. at 38. In response to a question from his attorney, Plaintiff testified that he was unable to return to work because of bipolar disorder, depression, and back pain. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Arthur Schmidt also testified at Plaintiff's hearing.  He testified that Plaintiff's PRW as a carpenter was skilled, heavy work. Tr. at 39. The ALJ asked the VE to consider a person the same age as Plaintiff with the same education and work experience who could perform light, unskilled work, required an at-will sit/stand option, and could bend and stoop no more than occasionally. *Id.* The VE testified that such a person could work as a parking lot attendant, tobacco sampler, and carton packer. Tr. at 40. In response to the ALJ's query, the VE opined that there was no work for an individual with all of the limitations described by Plaintiff in his testimony. Tr. at 40.

2.     Plaintiff's Second Administrative Hearing

a.     Plaintiff's Testimony

At the second hearing on December 9, 2011, Plaintiff testified that he had not worked since his previous hearing and continued to live at the same address with his wife and daughter. Tr. at 381. He stated that his wife had a part-time job at Sears. *Id.* He testified that

22

he served briefly in the Army at the age of 17 years old, but was discharged after being hospitalized for depression. *Id.*

Plaintiff stated that his bipolar disorder caused him to talk 100 miles an hour and that he sometimes took Valium when he was manic. Tr. at 385. He stated that he had been in treatment for the condition for a good while and that it helped, but did not completely solve the problem. *Id.* He testified that he still struggled with depression and experienced manic episodes and panic attacks. Tr. at 385–86. Plaintiff also described back pain caused by three herniated discs in his back. Tr. at 386. He stated that he sometimes could not move a certain way because of his back pain and, if he did, he would become completely paralyzed from the waist down. *Id.* He described this paralysis as occurring over 20 times in his lifetime. *Id.* He stated that during these episodes he could not feel his legs for 12–24 hours and lost control of his bladder. *Id.* He described constant pain in his left hip and intermittent severe back pain whenever he "wiped out" his back. Tr. at 386–87. Plaintiff testified to having breathing problems over the years for which his doctor prescribed oxygen during the night. Tr. at 387–88. However, he stated that he gave up the oxygen because he was unable to keep it in place while he was sleeping. Tr. at 388. He described his panic attacks as occurring when he got scared for no reason and said they caused his heart rate and blood pressure to go up. Tr. at 391. He stated that he had about five panic attacks per year. Tr. at 392.

Plaintiff stated that he could not sit for any length of time without having to get up and move around. Tr. at 387. He said he could not stand or sit too long or his back would start

hurting severely. *Id.* He stated that he tired easily and could not climb steps without becoming short of breath. Tr. at 388. He stated that he was able to walk at a regular pace and could do some mild exertion. *Id.* He estimated that he could be moderately active a couple of hours a day and that he spent five or six daylight hours resting. Tr. at 389–90.

Plaintiff testified that he could not wash dishes without causing back pain, but that he tried to help a little bit. Tr. at 390. He stated that he thought his medications could make him drowsy. *Id.*

### b.    Testimony of Plaintiff's Wife

Plaintiff's wife testified that his back went out two or three times a year causing him to be bedridden and sometimes taking a week to recover. Tr. at 394. She stated that these episodes were not caused by heavy lifting, but rather by simple things like hanging up clothes on the line. Tr. at 394–95. She stated that he was also weak, tired easily, became winded more easily than he used to, and that he could not catch his breath in heat. Tr. at 395. She testified that Plaintiff helped with vacuuming and laundry. Tr. at 396. She stated that he could not sit or stand for very long without getting restless. *Id.*

### c.    Vocational Expert Testimony

VE Arthur Schmidt also testified at Plaintiff's hearing.  He testified that Plaintiff's PRW as a carpenter was skilled, heavy work, and as a laborer was semi-skilled, heavy work. Tr. at 396. The ALJ asked the VE to consider a person the same age as Plaintiff with the same education and work experience who could perform light work with no climbing,

crawling, exposure to hazards, or concentrated exposure to lung irritants; required an at-will

sit/stand option; and required a low-stress setting with no more than occasional decision-

making or changes in the setting and no exposure to the general public. Tr. at 397. The VE

testified that such a person could work as a coupon recycler or a carton packer. *Id.* The ALJ

then asked the VE to consider a hypothetical individual with the same restrictions, but who

could work at a medium level and did not require a sit/stand option. *Id.* The VE testified that

such a person could work as a hand packer and an egg packer. Tr. at 398. In response to

questioning by Plaintiff's counsel, the VE opined that there was no work for either

hypothetical individual if the individual (1) were to miss work more than three days per

month for psychiatric symptoms or other health problems, or (2) could not concentrate for

more than two hours because of distractions based on psychiatric symptoms. Tr. at 398–99.

    3.    The ALJ's Findings

       In his February 2, 2012, decision, the ALJ made the following findings of fact and

conclusions of law:

    1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

    2.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

    3.    Since the alleged onset date of disability, April 1, 2003, the claimant has had the following severe impairments: degenerative disc disease and a bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

    4.    Since the alleged onset date of disability, April 1, 2003, the claimant has not had an impairment or combination of impairments that meets or medically

equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that since April 1, 2003, the claimant has the residual functional capacity to perform a significant range of light work activity as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour day with an at will sit/stand option. He is unable to climb or crawl and cannot perform work requiring exposure to hazards or concentrated exposure to lung irritants. The claimant is limited to low stress work (defined as requiring no more than occasional decision-making or changes in the work setting) with no exposure to the general public. Such a residual functional capacity is well supported by the weight of the evidence of record.

6.      Since April 1, 2003, as a result of his residual functional capacity as described above, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      Prior to the established disability onset date, the claimant was a younger individual and an individual closely approaching advanced age. On February 10, 2010, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Prior to February 10, 2010, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on February 10, 2010, the claimant has not been able to transfer job skills to other occupations (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Prior to February 10, 2010, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the

26

national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     Beginning on February 10, 2010, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform  (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12.     The claimant was not disabled prior to February 10, 2010, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

13.     The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2008, the date last insured (20 CFR 404.315(a) and 404.320(b)).

Tr. at 361–72.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ's listing analysis was flawed;

2)      The ALJ failed to assess the combined effects of Plaintiff's impairments; and

3)      The ALJ improperly discounted Plaintiff's credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a

27

"disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

29

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

    1.    The ALJ's listing analysis did not comply with the court's prior order.

Plaintiff contends the ALJ's listing analysis at step three was flawed because he failed to articulate the specific Listing under which he was analyzing Plaintiff's mental impairments, failed to address Plaintiff's bipolar disorder in the analysis, and failed to properly explain his findings. [Entry #22 at 10–11.] The Commissioner responds that the ALJ reasonably concluded that Plaintiff's impairments did not meet or equal a Listing and that any error in the analysis was harmless. [Entry #24 at 8–11.]

In determining whether a claimant meets or medically equals a Listed impairment, an ALJ is to "identif[y] the relevant listed impairments[,]" and then "compare[] each of the listed criteria to the evidence of [the claimant's] symptoms." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

The ALJ found Plaintiff had the severe impairments of bipolar disorder and degenerative disc disease. Tr. at 363. As the regulations and *Cook* require, the ALJ then considered whether these severe impairments met or equaled the criteria of any Listings. Tr. at 364–65. The ALJ began his analysis by stating that he had specifically considered Listing 1.00, Listing 11.00, and Listing 12.00. Tr. at 364. He then summarized the medical records and analyzed Plaintiff's degenerative disc disease and depression without reference to specific Listings. Tr. at 364–65.

31

Plaintiff argues that the ALJ's analysis was incomplete because it failed to specifically assess his bipolar disorder under Listing 12.04. The undersigned agrees. In his listing analysis, the ALJ referenced Listing 12.00, which generally covers mental disorders. 20 C.F.R. Pt. 404, Subpt. P, App.1. Within the broad category of mental disorders are numerous provisions addressing distinct mental disorders such as organic mental disorders (12.02); schizophrenic, paranoid, and other psychotic disorders (12.03); affective disorders (12.04); anxiety-related disorders (12.06); somatoform disorders (12.07); and personality disorders (12.08). *Id.* Contrary to the Commissioner's contention that the ALJ identified Listing 12.04 as the relevant listed impairment [Entry #24 at 8], the ALJ did not specify the mental impairment Listing upon which he relied in his analysis.

This court previously remanded Plaintiff's claim with instructions that the ALJ should consider Plaintiff's bipolar syndrome and any other mental-health related impairments and determine which mental impairment Listing or Listings are relevant. Tr. at 406–07, 435. After identifying the relevant Listing(s) and criteria, the ALJ was further instructed to compare Plaintiff's symptoms to all potentially-relevant criteria of those Listings as the regulations and *Cook* require. *Id.*

Not only did the ALJ fail to identify the relevant Listing, he also failed to address Plaintiff's bipolar disorder. In his listing analysis, he referenced only Plaintiff's depression. Although the Commissioner contends this was a mere scrivener's error and, in any event, was harmless [Entry #24 at 9–10], the court does not find it to be so. In its prior order, the court

specifically addressed the distinction between depression and bipolar disorder. Tr. at 431–34. Nevertheless, the ALJ addressed only depression.

Because the ALJ failed to address Plaintiff's bipolar disorder in his listing analysis and failed to sufficiently specify the Listing under which he was analyzing Plaintiff's impairments, the court cannot determine that his conclusion that Plaintiff did not meet a Listing was supported by substantial evidence. On remand, the ALJ is again instructed to consider Plaintiff's bipolar syndrome and any other mental-health related impairments and determine which mental impairment Listing or Listings are relevant. After identifying the relevant Listing(s) and criteria, the ALJ is to compare Plaintiff's symptoms to all potentially-relevant criteria of those Listings as the regulations and *Cook* require.

### 2.     Plaintiff's remaining allegations of error

Plaintiff also argues that the ALJ failed to properly consider the combined effect of his impairments and improperly discounted his credibility. [Entry #22 at 11–15.] In light of the decision to remand based on the ALJ's flawed listing analysis, the court does not address Plaintiff's remaining allegations of error in detail. On remand, however, the ALJ is directed to specifically address the effect of Plaintiff's combined impairments on his RFC. The court notes that it finds no obvious error in the ALJ's credibility assessment and references its prior findings on this issue. *See* Tr. at 441–45.

### III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to

determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g).

IT IS SO ORDERED.

Shiva V. Hodges

February 28, 2013                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge